IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



**FILED**

JUN 2 0 2014

Clerk, U.S. District Court
District Of Montana
Billings

| | |
|---|---|
| COMBINED INSURANCE COMPANY OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JESSICA HUBLEY, JEFFREY SCOTT ELLIS, and MARK STUBER,<br><br>Defendants. | CV 14-72-BLG-SPW<br><br><br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |

## INTRODUCTION

A Preliminary Injunction Hearing was held on June, 17, 2014, as requested in Plaintiff's Emergency Motion for Temporary Restraining Order, Scheduling of Preliminary Injunction Hearing, and Order for Expedited Discovery. (Doc. 3) Ms. Stuart of the firm Husch Blackwell LLP and Mr. Nord from the firm Crist, Krogh, Butler & Nord, LLC represented the Defendants Jessica Hubley ("Hubley"), Jeffrey Scott Ellis ("Ellis"), and Mark Stuber ("Stuber") (collectively, "Defendants"). Nancy Silvernagel, a compliance investigator, appeared on behalf of Combined Insurance Company of America ("Combined") which was represented by Joshua Kirkpatrick of the firm Littler Mendelson, P.C.

Having heard the evidence and reviewed the briefs of both parties, the Court

1

now makes the following:

## FINDINGS OF FACT

1.  Defendants Jessica Hubley, Jeffrey Ellis, and Mark Stuber have been citizens of, and domiciled in, the State of Montana at all times pertinent to this action.

2.  Plaintiff Combined is an Illinois corporation with its principal place of business in Glenview, Illinois. The events leading to this lawsuit occurred in Montana.

### Procedural History

3.  Combined brought claims for breach of contract (Hubley), tortious interference with prospective advantage (all Defendants), misappropriation of trade secrets and confidential information (all Defendants), fraud (all Defendants), and conversion (Hubley) on June 5, 2014. (Doc. 1).

4.  Combined alleges that Hubley has violated contractual agreements prohibiting her from utilizing the confidential and trade secret information that she obtained through her employment at Combined. Further, Combined states that Hubley either directly or indirectly, on her own or in conjunction with others, solicited or induced Combined policyholders to purchase insurance from a competitor of Combined or to cancel, lapse, or fail to renew their Combined policies within the geographic territory where she

worked for Combined.

5.      Specifically, Combined alleges Hubley has acted in concert with and through Defendants Ellis and Stuber to actively solicit and induce Combined policyholders to cancel their Combined policies and purchase Liberty National Life Insurance Company ("Liberty") policies. Combined states that Hubley provided Ellis and Stuber with confidential and trade secret information regarding Combined's policyholders and their specific policies so that they could target these policyholders on behalf of Liberty.

6.      Combined also alleges that Ellis and Stuber have contacted Combined policyholders to solicit them to cancel their Combined policies and purchase Liberty policies based on fraudulent misrepresentations that Combined had been purchased by Liberty and the policyholders, therefore, needed to sign their policies over to Liberty.

7.      As a result, Combined states that irreparable harm has been done and it is therefore entitled to injunctive relief against Defendant Hubley (whose employment agreement calls for arbitration concerning monetary damages), and injunctive relief, damages, and reasonable attorneys' fees against Defendants Ellis and Stuber.

8.      On June 5, 2014, Combined filed an Emergency Motion for Temporary Restraining Order, Scheduling of Preliminary Injunction Hearing, and Order

for Expedited Discovery.  Combined sought an order requiring Hubley, Ellis, and Stuber to return Combined's confidential and trade secret information and refrain from using such information to target its policyholders.  It also requested that Defendants be temporarily restrained from making future false statements about Combined and that Hubley be temporarily restrained from further breaches of her contractual obligations. Combined asked that such an order continue through the ruling date on a subsequent preliminary injunction hearing, with expedited discovery in the interim.

9.    This Court, on June 6, 2014, denied Combined's requests for a TRO and expedited discovery.  (Doc. 7).  It did, however, grant Plaintiff's request for a preliminary injunction hearing.

10.   Defendants filed a response to the Emergency Motion for Temorary Restraining Order, Scheduling of Preliminary Injunction Hearing, and Order for Expedited Discovery on June 17, 2014.  (Doc. 14)

11.   Defendants contend that Hubley returned all confidential information in her possession and received confirmation of its return from Combined.  They state that it is for this reason that Combined cannot identify any specific confidential or trade secret information allegedly taken or retained by Hubley.  Defendants also claim that neither Ellis nor Stuber ever had

4

possession of or access to any Combined purported confidential information.

12.    Defendants further contend that Hubley has not targeted or solicited any
       Combined policyholders or induced anyone to cancel a Combined policy.
       They state that Combined is attempting to impose Hubley's alleged non-
       compete obligation on all Liberty agents working out of the Billings office,
       effectively reducing competition and interfering with the agents' ability to
       earn a living. Defendants claim that at no time did Hubley provide Ellis, or
       any other agent, information about Combined policyholders or suggest that
       Combined policyholders be targeted, rather Combined's business practices
       led to its customers' dissatisfaction and subsequent cancellation of their
       policies.

## Background

13.    Combined is engaged in the business of providing supplemental accident &
       health insurance and life insurance.

14.    Liberty is also engaged in the business of providing supplemental accident &
       health insurance and life insurance, and is a competitor of Combined.

15.    Following its acquisition in 2008 by ACE, Ltd., Combined significantly
       reduced its number of agents in the Montana and Wyoming areas.

16.    Combined's sales organization includes Agents, Account Executives,
       Territory Managers and Market Directors. Agents and Account Executives

report to Territory Managers, who in turn report to Market Directors. Market directors at Combined have complete access to policyholder information including information about the policyholders and the policies they have with Combined.

17. Defendant Hubley worked for Combined beginning in May 2007 and was promoted to Market Director in Billings, Montana on October 24, 2011, a position she retained until she voluntarily departed on August 31, 2012.

18. After her promotion to Market Director in October of 2011, Hubley signed an employment agreement relating to that promotion sometime in or about May 2012. (Doc. 1-2). This was the only employment agreement entered into evidence.

19. In October 2012, Hubley set up an agency in Billings to sell Liberty products. Since January 2013, the agency has sold more than 1230 policies.

20. Defendants Ellis and Stuber work for Hubley at her agency.

21. In April 2014, Combined began to notice a significant number of faxed letters from policyholders in Montana asking Combined to stop drafting from their bank accounts in relation to their Combined insurance policies.

22. In May 2014, Combined received eleven faxed letters making the same requests. Combined noticed that these 11 letters, as well as several of the letters faxed in April, were all faxed from the same UPS Store location in

6

Billings, Montana. That UPS Store is approximately one half mile from Hubley's business address. Also, the wording of each letter was similar and the handwriting on several of the letters appeared to be the same.

23.  All of the faxed letters included form numbers for the policies which the policyholders wouldn't have and the agents often have to look up.

24.  Combined asked Nancy Silvernagle from its Field Compliance and Investigations Department to investigate what was happening by contacting the policyholders who had signed these letters.

25.  Ms. Silvernagle called 33 policyholders who had cancelled a total of 100 Combined policies. Ms. Silvernagle was able to talk to 12 of the 33, seven of whom disclosed that they were switching to Liberty. Six of those seven disclosed that they were going to Liberty because Combined had either been bought by or had merged with Liberty.

26.  One of the policyholders whom Ms. Silvernagel called, Laurie Tschetter, informed Ms. Silvernagel that she had been misled by two men who came to her home/business and told her that Liberty had purchased Combined and that they were consolidating Combined policies into Liberty policies. Ms. Tschetter states that the stop draft notice she signed was not drafted by her and that she did not provide any information, including form numbers, with regard to the six or seven policies she held with Combined. At the time of

7

the call, Ms. Tschetter did not have the names of the two men who had visited her, but Ms. Tschetter later contacted Liberty and found out that it was Ellis and Stuber, which she then relayed to Ms. Silvernagel.

27.   A second policyholder, Colin Brown, had a supplemental accident insurance policy through Combined. Mr. Brown states that Ellis and another Liberty agent showed up at his house on May 10, 2014, and represented that they were Combined representatives. They had been in contact with Mr. Brown since March and, upon showing up at his residence unannounced, told him that Liberty had purchased Combined and that he needed to switch his Combined insurance coverage over to Liberty. Mr. Brown was told that if he didn't feel comfortable providing personal information at that time, he could come into the office on Monday to complete the transaction. It was at this point that Mr. Brown realized the two men were representatives of Liberty and not Combined. During the conversation, Ellis and the other agent mentioned that their manager at Liberty was Hubley. Mr. Brown had contact with Hubley when she had worked at Combined. Mr. Brown then decided to sign up for a new policy with Liberty and signed a stop draft order for his Combined policy. The stop draft order was not written by Mr. Brown and he did not provide the form number of his accident policy.

28.   Mr. Brown also provided Ms. Silvernagel with Ellis' business card. The

8

business card lists Ellis as an agent with Liberty at the Hubley agency in Billings.

29. During her investigation, Ms. Silvernagel found several other former Combined customers who had similar stories to those of Brown and Tschetter. Jody Marshall stated that two young individuals in their thirties, male and female, came to her house. The female said that Combined had been bought out by Liberty and that she had to convert her policies.

30. Ms. Brothers placed a call to Combined to inquire as to whether it had really been bought out by Liberty. She specifically stated that Jessica Hubley had said that Combined had been bought out by Liberty.

31. Another of the policyholders whom Ms. Silvernagel spoke to, Steven Kroll, told Ms. Silvernagel that Ellis had contacted him and told him that Combined had been bought and sold a few times, and that Combined did not have any ability to service customers in the Wyoming area.

32. Cynthia Sapp told Ms. Silvernagle that a man and a woman came to see her and told her that Combined had been bought out or merged with another company.

33. Ellis testified that the Defendants did not use any information that Hubley obtained from Combined in soliciting business from policyholders such as Mr. Brown and Ms. Tschetter. Ellis stated that he located Mr. Brown and

9

Ms. Tschetter using public sources. It was only upon speaking to Mr. Brown and Ms. Tschetter that Ellis learned that they held policies with Combined. Ellis further stated that Mr. Brown and Ms. Tschetter expressed dissatisfaction with their Combined policies. Only after that did they switch their policies over to Liberty. Ellis agrees that he wrote some of the stop draft notes received by Combined, and that he only used the UPS store as the Defendants' office does not have a fax machine. Ellis testified that the contrary testimony of Mr. Brown, Ms. Tschetter, and Ms. Silvernagle is false.

34. The Court does not find Ellis's testimony credible. Rather, the Court believes Mr. Brown and Ms. Tschetter's testimony. The Court finds that the Defendants approached Combined's policyholders under the false pretenses described above.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction, as there is complete diversity and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. This Court is also the proper venue, as the alleged wrongdoing occurred in Yellowstone and Big Horn Counties and the Defendants reside in Yellowstone County. L.R. 1.2(c)(1), 3.2(b). Since this is a diversity action, this Court will apply Montana's substantive law as to Combined's claims. *Med. Laboratory Mgt.*

10

*Consultants v. Am. Broad. Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

2.      "A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (internal quotation omitted). To obtain a preliminary injunction, Combined must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008). While the plaintiff must show the existence of all four elements, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Therefore, the likelihood of success is not an absolute requirement. "Rather, serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1085 (9th Cir. 2014) (internal citation omitted).

3.      The plaintiff's "burden of proof at the preliminary injunction phase tracks the burden of proof at trial." *Thalheimer v. City of San Diego*, 645 F.3d

11

1109, 1116 (9th Cir. 2011). The district court has discretion in deciding whether to grant a preliminary injunction. *Cottrell*, 632 F.3d at 1131. Finally, relevant here, a verified complaint may be treated as an affidavit, and therefore is evidence that may support injunctive relief. *Thalheimer*, 645 F.3d at 1116.

## Likelihood of Success on the Merits

4.    As discussed above, Combined has brought five claims against the Defendants: (1) Breach of contract; (2) Tortious interference with prospective advantage; (3) Misappropriation of trade secrets and confidential information; (4) Fraud; and (5) Conversion.

### *Breach of Contract*

5.    Combined alleges that Hubley breached the confidentiality and customer non-solicitation provisions contained in her employment agreement with Combined. The only employment agreement provided to the Court was the one signed sometime in May 2012. *See* Doc. 1-2. As discussed above, Hubley earned her promotion in October 2011. Since Combined did not show that Hubley received any additional consideration for signing this employment agreement, it is not enforceable. *Access Organics, Inc. v. Hernandez*, 175 P.3d 899, 904 (Mont. 2008).

6.    *Access Organics* is directly on point. In *Access Organics*, employee

12

Hernandez signed a non-compete agreement with Access Organics at least one month after he was promoted to sales manager. Hernandez later allegedly breached that agreement by joining a competing business. Access Organics brought suit seeking enforcement of the non-compete agreement. *Id.* at 901.

7.  The Montana Supreme Court held that the non-compete agreement was unenforceable as it was not supported by "good consideration." *Id.* at 904. The Court recognized that past consideration is insufficient to support a new contract. *Id.* at 903. Therefore, Hernandez's promotion and corresponding salary increase was not adequate consideration to support the non-compete agreement. *Id.* Further, continued employment for an at-will employee is insufficient consideration. *Id.*

8.  Here, Combined has not shown any evidence that Hubley's employment agreement was supported by consideration. Hubley's promotion to Market Director occurred on October 24, 2011. Although Combined claims that Hubley signed an employment agreement on the date of her promotion (Doc. 1 at 6), the only employment agreement received into evidence was one signed sometime in May 2012. Combined does not point to any other consideration to support the employment agreement. Pursuant to *Access Organics*, the contract is unenforceable.

13

9.  With the evidence received by the Court, it is unlikely that Combined will succeed on the merits of its breach of contract claim.

*Tortious Interference with Prospective Advantage*

10. Under Montana law, a cause of action for intentional interference with prospective economic advantage arises when one's acts: (1) were intentional and willful; (2) were calculated to cause damage to the plaintiff in his or her business; (3) were done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor; and (4) that actual damages and loss resulted. *Bolz v. Myers*, 651 P.2d 606, 611 (Mont. 1982).

11. Courts recognize intentional interference with prospective economic advantage when a third party wrongfully interferes with the economic relationships of others. *Maloney v. Home & Inv. Ctr.*, 994 P.2d 1124, 1132 (Mont. 2000).

12. The Defendants' actions were intentional and willful in regard to them actively contacting current Combined customers and soliciting them to purchase Liberty insurance policies under the pretense that Combined was somehow now a part of Liberty and those customers' policies had to be updated.

13. Calculated to cause damage means that the defendant "intentionally

proceeded with actions that would foreseeably damage the [plaintiff]."

*Maloney*, 994 P.2d at 1132.

14. Damage can be suffered by the plaintiff as a result of the defendant's actions and still not be calculated if the defendant had a legally recognizable basis for acting. *Smith v. Barrett*, 788 P.2d 324, 327 (Mont. 1990).

15. Defendants' actions were calculated because they "intentionally proceeded with actions that would foreseeably damage" Combined. *Smith*, 788 P.2d at 327. Defendants represented to Combined customers that their insurance agency, Liberty, had either bought or merged with Combined and the customers therefore needed to convert their Combined policies to Liberty policies. These actions were not only intentional, but damage to Combined was reasonably foreseeable.

16. The next element of tortious interference with prospective advantage is whether the Defendants' acts were done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor. *Bolz*, 651 P.2d at 611.

17. Montana employs several factors to consider in determining if an actor's behavior was improper: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social

15

interests in protecting the freedom of the action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties. *Restatement (Second) of Torts* § 767 (1979).

18. The issue to determine is "whether, upon consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another." *Farrington v. Buttrey Food and Drug Stores Co.*, 900 P.2d 277, 279 (Mont. 1995) (quoting *Restatement (Second) of Torts* § 767 cmt. b).

19. The conduct of the Defendants in this case is not permissible and therefore improper. Defendants offended the duties imposed upon insurance professionals by inducing customers to purchase insurance policies based on misrepresentation. While competition is not a tort, the actions taken here went far beyond legitimate business purposes and crossed into the realm of unethical behavior.

20. The final element of tortious interference with prospective advantage is that actual damages and loss resulted. *Bolz*, 651 P.2d at 611.

21. Plaintiff has almost certainly suffered damages as a result of Defendants' improper behavior. It is clear from Mr. Brown and Ms. Teschetters' testimony that they were induced to cancel their policies under false

representations made by the Defendants. These cancellations not only resulted in lost profits for the Plaintiff but also likely led to a loss of good will and customer confidence. If, as indicated by Ms. Silvernagle's testimony, there are other Combined customers who were persuaded to change policies by the Defendants, it is likely that Combined's damages calculation is even higher.

*Misappropriation of trade secrets and confidential information*

22.  Montana has adopted the Uniform Trade Secrets Act. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1112 (9th Cir. 2001). To prevail on their trade secret misappropriation claim, Combined must show "two primary elements: (1) the existence of a trade secret, and (2) misappropriation of the trade secret." *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003) (applying identical provisions in California's Uniform Trade Secret Act).

23.  A trade secret is defined as:

> information or computer software, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> >
> > (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

17

Mont. Code Ann. § 30-14-402(4). "It is well-established that a customer list may constitute a protectable trade secret." *Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*, 2013 WL 2151553 at *6 (E.D. Cal. 2013) (internal citation omitted). *See also MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993). "Customer lists containing merely public information that can easily be compiled by third parties will not be protected as trade secrets; however, where the party compiling the customer lists, while using public information as a source, ... expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection." *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F. Supp. 2d 1057, 1066 (D. Kan. 2001) (internal citation omitted) (ellipsis in original) (applying identical provisions in Kansas's Uniform Trade Secrets Act).

24. Information used by the Defendants to target Combined's policyholders is likely a trade secret. In soliciting business from policyholders such as Mr. Brown and Ms. Tschetter, the Defendants knew their names, addresses, that they owned Combined policies, which type of policies they held, and which form numbers the policies used. This is beyond public information that could be easily compiled by a third party. Rather, it is a compilation of information that derives independent economic value intended by Combined

18

to remain secret.

25. The second step is determining whether the trade secret was misappropriated. Misappropriation is defined as:

> (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (b) disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
>>
>>> (A) derived from or through a person who had used improper means to acquire it;
>>>
>>> (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>>
>>> (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>>
>> (iii) before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Mont. Code Ann. § 30-14-402(2).

26. The Defendants likely misappropriated Combined's trade secrets in soliciting business from their policyholders. Hubley knew it would be inappropriate to use such information and that it would be improper to use it

19

outside of her employment with Combined. The Court does not find credible Ellis's testimony that they only solicited business from Mr. Brown and Ms. Tschetter after finding out their information exclusively through public sources. Rather, the Court finds the testimony from Mr. Brown and Ms. Tschetter more credible. There is no way that Ellis and Stuber provided specific information regarding their policies with Combined unless they obtained misappropriated trade secrets from Hubley.

27. The Court does not know exactly how Hubley misappropriated the trade secrets. She could have printed off lead cards, copied documents, or simply handwritten the information on a notepad. However, at this stage Combined does not need to prove exactly how the misappropriation took place; rather it only needs to "make a clear showing that misappropriation *likely* occurred." *Farmers Ins. Exch.*, 2013 WL 2151553 at * 10 (emphasis in original). Combined successful made such a showing.

28. Combined is likely to prevail on their trade secrets misappropriation claim.

*Fraud*

29. The elements of fraud are: (1) a representation; (2) the falsity of that representation; (3) the materiality of the representation; (4) the speaker's knowledge of the representation's falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the person

and in the manner reasonably contemplated; (6) the hearer's ignorance of the representation's falsity; (7) the hearer's reliance upon the truth of the representation; (8) the hearer's right to rely upon the representation; and (9) the hearer's consequent and proximate injury or damages caused by their reliance on the representation. *Morrow v. Bank of Am., N.A.*, 324 P.3d 1167, 1182 (Mont. 2014).

30.     Combined argues that all nine elements are met. However, Combined improperly inserts itself as the "hearer" for the purposes of its analysis. Doc. 4 at 18. Combined never heard, nor relied upon, the misrepresentations made by the Defendants. Combined also states that the policyholders suffered harm by being misled by the Defendants. Assuming that as true, the policyholders are not parties to this action, and Combined cannot rely on an alleged harm suffered by another party to support a preliminary injunction.

31.     Combined is unlikely to succeed on the merits of its fraud claim.

*Conversion*

32.     Combined pleads a claim of conversion, arguing that the Defendants exercised unauthorized dominion over their trade secrets. However, their claim of misappropriation of trade secrets preempts this argument.

33.     Mont. Code Ann. § 30-14-408(1) provides that the Uniform Trade Secrets

Act "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." In order to avoid having a conversion claim preempted by its other claim under the Uniform Trade Secrets Act, the plaintiff must allege that the conversion claim is based on a distinct nucleus of facts. *Lang. Line Services, Inc. v. Lang. Services Associates, Inc.*, 944 F. Supp. 2d 775, 781 (N.D. Cal. 2013).

34. Here, Combined is operating on the same facts for both its trade secrets claim and its conversion claim. Therefore, Combined's conversion claim is preempted.

35. Combined is not likely to prevail on its claim for conversion.

*Summary*

36. In summary, Combined is likely to prevail on its claims for tortious interference with prospective advantage and misappropriation of trade secrets.

**Irreparable Harm**

37. The irreparable harm must be likely in the absence of an injunction, not merely possible. *Winter*, 555 U.S. at 22. "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001).

38. Here, Combined is likely to suffer irreparable injury unless the Defendants are enjoined from further soliciting its customers. As Ms. Silvernagel testified, the majority of the duped customers are unlikely to switch back to Combined, even after the Defendants' deception is revealed to them. This loss of goodwill is difficult to calculate. Combined has already lost a number of clients, and it should not be forced to suffer the loss of more policyholders while this litigation proceeds.

39. As the Defendants' actions deteriorate Combined's goodwill and prospective future business, the harm is irreparable.

## Balancing of the Equities

40. In deciding whether Combined is entitled to a preliminary injunction, this Court has a duty to balance the interests of both Combined and the Defendants and weigh the damage to each. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).

41. As discussed above, Combined will be irreparably harmed if the Defendants continue to solicit their policyholders. Any damage caused by the injunction to the Defendants would be minimal in comparison.

42. Further, the Court will narrow Combined's request for injunctive relief. In its motion, Combined requests this Court to enjoin "Defendant Hubley from directly or indirectly, soliciting or attempting to solicit any Combined

23

policyholder in Montana or Wyoming, or assist anyone else in so doing."
Doc. 4 at 24. This Court finds that language is overbroad. The Defendants
should not be prohibited from selling insurance to a prospective customer
through legitimate means if the customer happens to have a policy with
Combined. Rather, the Defendants should only be prohibited from using
information that Hubley acquired while she was employed with Combined.

43. The injunction is narrow enough that it only applies to the Defendants'
intentional solicitation of Combined policyholders. Defendants can continue
to conduct business and sell policies to new customers. They just cannot
solicit business from current Combined policyholders using trade secrets
obtained by Hubley. This hardship is not nearly enough to outweigh the
hardship caused to Combined's business should the Defendants continue to
misappropriate their trade secrets.

44. The balancing of the equities tips in Combined's favor.

**Public Interest**

45. "The public interest inquiry primarily addresses impact on non-parties rather
than parties." *Inst. of Cetacean Research v. Sea Shepherd Conservation
Soc.*, 725 F.3d 940, 946 (9th Cir. 2013) (internal citation omitted). This
Court should look beyond the parties and into the public consequences when
issuing an injunction. *Bernhardt v. Los Angeles County*, 339 F.3d 920, 931

24

(9th Cir. 2003). However, when the reach of a preliminary injunction is narrow and limited to the parties, the public interest is "at most a neutral factor in the analysis." *Stormans, Inc.* 586 F.3d at 1139.

46. Here, the injunction is narrow and limited to the parties. Therefore, the public interest is a "neutral factor." Broadly speaking, this injunction is in the public interest as it allows insurance to be sold on the free market without the use of misappropriated trade secrets.

## Conclusion

47. All four factors identified in *Winter* favor the granting of a preliminary injunction.

## ORDER

Accordingly, IT IS HEREBY ORDERED that Combined's Motion for Preliminary Injunction (Doc. 3) is GRANTED IN PART as follows:

1. All Defendants shall immediately return all of Combined's confidential and trade secret information, including without limitation all policyholder and prospective policyholder information originating with Combined.

2. All Defendants shall not use any of Combined's confidential and trade secret information, including without limitation all policyholder and prospective policyholder information originating with Combined.

3. All Defendants shall not falsely state to members of the public that

Combined has been sold and/or that Combined policyholders are required to switch their policies to Liberty National.

DATED this 20ᵗʰ day of June, 2014.

*Susan P. Watters*

SUSAN P. WATTERS
United States District Judge